United States v. Yuck, Thomas, and Perrella. Good morning, Your Honor. May it please the Court. Good morning. My name is Steven Preziosi. I represent the appellant, Mr. Felix Perrella. Your Honor, the lower court held that venue was proper here in the Southern District of New York based on two facts. One was that Mr. Derek Jackson, a member of the alleged conspiracy, drove approximately 1,400 miles from Miami to John F. Kennedy Airport here in New York. The other fact was that the DEA brought Mr. Jackson, after he was arrested, into Manhattan in order to place phone calls to other members of the alleged conspiracy still in Florida. Based on those two facts, they said that venue was proper here in the Southern District of New York. And I think the lower court's holding was erroneous for a couple of reasons. Well, there was a little bit more than that, I think. It was the notion that you get a better price for narcotics in New York and some indications that Jackson did have some earlier contacts in New York. Your Honor, that was the argument that it was reasonably foreseeable that Mr. Jackson would come to New York. And the government argues here today that it is reasonably foreseeable that Mr. Jackson would come to sell in New York because of the greater price. And, Judge, I refer to this argument as the overly generous drug dealer argument. And this is why. If it were reasonably foreseeable that Mr. Jackson would come to New York to sell at a greater price, and the evidence at trial was the greater price was between $40,000 and $45,000 per kilo of cocaine. If that were the case, if that were reasonably foreseeable, then Mr. Perilla and Mr. Jackson allegedly, according to their one witness, would not have sold to them at such a low price. The price that he sold to them, according to their one witness, was $26,000 per kilo. That would allow Mr. Jackson to profit approximately $475,000 for his trip to New York. If it were reasonably foreseeable that that would have been Mr. Jackson's profit margin, they would have never sold to him at such a low price, the overly generous drug dealer theory. Let me ask about the way in which the market price evidence is assumed to be attributable in part, or you can draw an inference vis-a-vis your client. So, Mr. Perilla, as I understand it, the only evidence of the market price differential came from the special agent who testified at trial. Is there any indication in the record that there was any information or any knowledge or any communication which conveyed that particular information to Mr. Perilla, or anything that indicates that Mr. Perilla otherwise would have had information regarding the market price in his possession otherwise? None, Your Honor. None. None whatsoever. There was in fact no communication between Mr. Jackson and Mr. Perilla. This Mr. Thomas and I believe Mr. Tang Yuk were the go-betweens. Mr. Perilla was never – I don't believe they had even ever met. And there was no knowledge attributed to Mr. Perilla that the market price in New York was significantly higher. Mr. Perilla and the entirety of this alleged conspiracy took place between St. Croix and Miami, Florida. Every single fact other than Mr. Jackson crossing over the Verrazano Bridge took place in St. Croix, New York. Doesn't Rami tell us that his drive across the Verrazano Narrows Bridge and even the telephone calls both I guess made from Manhattan after he made his sale in Queens were enough to make venue in the Southern District constitutionally correct? No, Your Honor. And so why is that not? Because Rami and the other case in the Second Circuit was Rami was the seminal case and Ramirez-Amaya. And Rami relied on two other cases. It relied on United States v. Cordero, which was a First Circuit case, and the Andrews v. United States, which was the Seventh Circuit's case, making Rami the seminal case here in the Second Circuit. In each of those four cases, the Romney, Ramirez-Amaya, the Cordero, and the Andrews case, each one of those cases, the intent, the object of the conspiracy was to sell drugs in that venue. Each one of those cases said it was phone calls plus, driving through the airspace plus. That was the Ramirez-Amaya case where he drove the DE agent flew a plane through the airspace of the Southern District of New York. But he landed in Westchester. He landed in the Southern District of New York. Romney was the Dutch drug dealer who spoke to a DE agent by phone. His intent, his objective was to sell drugs in New York. Cordero was the drug dealer who spoke to the DE agent in Puerto Rico by phone. His objective was to sell drugs in Puerto Rico. Let me just ask you in terms of your view of the standard, and you're implying a view of the standard right now. So, constitutionally, we know that a defendant must be tried in the district where the crime was committed and or in a conspiracy context where it was foreseeable that an act would occur. The question in a conspiracy context, and here's the standard issue that I want you to focus on, is whether or not the foreseeability must relate in terms of evidence, preponderance of evidence, to each and every defendant. In other words, for venue, for a venue determination in a conspiracy case, must the jury have sufficient evidence as to foreseeability as to each defendant, or is it sufficient that venue be appropriate as to one of but not all of the co-conspirators? Do you understand the question? Yes, I do. And I believe it is the constitutional right of every defendant, each and every defendant within the alleged conspiracy, Your Honor. I don't see that any cases that say that we attribute reasonable foreseeability to one and apply it to all. So you would need to find that it was foreseeable to Perea himself? Yes, and each and every member of the conspiracy. And if one of them happened to have an overt act that actually was committed in the district, then you would – that one might have a different basis for venue, but each one is looked at individually in your view? Yes, correct. And, Your Honor, here is the distinct – I don't want to take up too much of my time. I see I'm running over. We have three minutes for rebuttal. You can use some of it now. Why don't you answer the question? Judge, I think we have distinguishing facts here. As opposed to Ramirez, Amaya, and Romney, it was never the objective of the conspiracy to come to New York. And it is undisputed in this case that nobody knew Mr. Jackson was coming to New York. And the other half of my question with regards to the price was, I don't think Mr. Jackson even knew or anticipated that he was coming to New York. Because why else would he sell two kilograms of cocaine, according to their one witness, to Mr. Tang Yuk for a profit of $2,000, when if he knew he were coming to New York, he would profit by $38,000, according to their witness. It was never anticipated. And I don't believe Mr. Jackson even owned a car because he had to rent a car to get here. I'll reserve the balance of my time. Thank you. Good morning, Your Honors. May it please the Court. My name is Christopher Kniff, and I represent the appellant, Kirk Tang Yuk, and also represented him at the trial below before Judge Nathan. The place I'd like to start is kind of a summary of the way the trial unfolded because I think it's critical to this issue of venue. Judge Carney, you are correct that the issue of the Verrazano Bridge was very much front and center when the trial began. In fact, the jury charge initially focused on that aspect of venue. In fact, during the trial, the government put on evidence of GPS tracking and the like, including a map that showed Mr. Jackson going over the Verrazano Bridge. The fact of the matter is that wasn't contested. What evidence is there that that was foreseeable to the defendants? None, Your Honor, and that's really the key. Other than the notion that you can get more money in New York. That's the key, Your Honor. There was no evidence. Didn't your client know Mr. Jackson and know he was from the tri-state area or had contacts up here and a daughter at school in New Jersey or whatever? I respectfully submit to Your Honor that that argument by the government is an exaggeration of what the actual record was. Of course, the cooperator in the course of his testimony testified about his background, including some of the information in there, which is cited to the appendix. But, in fact, as my colleague pointed out, this was a conspiracy that involved the import of cocaine from St. Croix to Miami, Florida. My client, as laid out in the brief, is really a local drug dealer connected to this. Never been to New York, even. Never been to New York. He never disputed during the course of the trial that he received and sold two kilograms of cocaine literally within blocks of receiving it in Miami, Florida. Moreover, when you look at the consensual recordings. He is on one of the phone calls. He's called and Jackson says, I'm in New York. I'd like to address that, Your Honor. One question I had was, is it enough to say I'm in New York because New York could include the other district? Well, Your Honor, that I think is central to Romy and that was a large discussion during the jury charge because it's not enough. Romy says very clearly, a chance call by somebody from New York is not sufficient to establish venue. And what was critical in Romy, which we argued to Judge Nathan at the charge, was that Romy injected himself into the venue. There's obviously no requirement to send the drugs into New York. And it was in one of his initial calls with the cooperator that the cooperator mentioned he was in the shadow of the World Trade Center and made very clear to Romy, I am a Manhattan drug dealer. And Romy took up with that and continued making calls. Here, when you look at the series of consensual recordings that were done, in fact, and it's noted in our brief, the cooperator Jackson actually tells my client when he asks him, where are you, it's none of your business where I am. And, in fact, it was not until the last call, which I respectfully submit to you, Your Honor. That's the October 4th call? Your Honors, was made with the sole purpose of having that cooperator announced to the other defendants. There are several issues related to that. But one question simply is, is it enough for Jackson to say I'm in New York to implicate the southern district of New York as opposed to the eastern district? That's one issue. Another issue is the agents told him to say New York. And so if there's a case for a contrived venue, I suppose this is the case where the issue is raised. But then another issue then is, are there events within the district, the southern district, after the defendants are aware that Jackson is in New York? From my client's perspective, Your Honor, there are none. But there are conversations with Thomas. As I understand it, after your client has spoken to Mr. Jackson on October 4th, there are then subsequent conversations between Thomas and Mr. Jackson. Is there an inference which should be drawn in favor of the government, but that the information then that was being conveyed to Thomas was something that was being similarly conveyed to your client? There was no evidence to that regard at the trial, Your Honor. I think it's very fair, Judge Chin, I think you're hitting the nail on the head. This is a case where the government caught somebody in court. I see my time is up. If I can just finish my thought. This is a case where the government had a successful seizure in Queens, New York. They seized 25 kilograms of cocaine because an informant told them that Jackson was coming. They then went up on a wire and they manufactured a case that had nothing to do with this district except the fact that Jackson unilaterally, and I think it's clear from the record, unilaterally chose to come to New York to sell his portion of the drugs. And as I mentioned in my brief, my client had no knowledge and in fact was kept out of the overall scheme and the fact that there were even other drugs available. I see my time is up, so I will sit down. Thank you. We'll hear from your colleague. Good morning. May it please the Court. Kei Walker on behalf of Gary Thomas. As my other counsel have argued, the main focus of Mr. Thomas' argument is also the issue concerning venue. And if I may start off with answering just a couple of the questions that Your Honors have already posed as it pertains to my client specifically. With regards to the phone call, I think the question was posed whether that phone call was enough. Which one? I think for Thomas, there's the October 4th and October 12th, so there's subsequent phone calls as well. Correct. So the first phone call, the October 4th phone call, which was made at the direction of the government, that phone call in and of itself is not sufficient to establish foreseeability or venue for two reasons. One is that Rami was clear, to the extent that I agree with the holding of Rami, Rami was clear that the call in and of itself is not what establishes venue. The call itself must be in furtherance of the conspiracy. This call was made at the direction of the government. It could not have furthered the conspiracy on behalf of Mr. Thomas. There were subsequent texts where Thomas is saying to Jackson, you know, I want my money, in essence. And is that a text that is in furtherance of the conspiracy? Thomas wants to get paid. And is it being sent to someone he knows is in the Southern District of New York? The text in and of itself is in furtherance of the conspiracy, but not for purposes of venue because it was never established that Mr. Thomas knew that Derrick Jackson was in New York. In my brief, I argue that when you look at the call itself as the call to Mr. Thomas, you can see it ended before I'm in New York. Exactly. Was that argued to the jury? That was not argued to the jury specifically, but it came out during trial and it actually came out through the questions of the government's attorney. When the government's attorney was questioning Derrick Jackson about the call, he even said, I realize that this call ended abruptly. And then there was a subsequent call within a few minutes, and during that subsequent call there was no discussion of New York. Isn't that particular point about whether or not the word New York is in or out of that October 4th call something where the facts have to be strongly drawn in the government's favor on this kind of motion? So don't we have to assume effectively on this appeal that New York is in, insofar as the October 4th call is concerned, and then go on? If we don't think that October 4th is sufficient for venue, is there anything else that follows October 4th? I don't believe there is anything else that follows October 4th that's sufficient for venue. And I say that because even when Derrick Jackson placed the call to Mr. Thomas and he placed the call to Mr. Tanyuk, he didn't say, I'm in New York selling the cocaine. He simply informed them that he was in New York. He didn't explain why he was in New York. He didn't explain that he was in New York to do. Couldn't the jury have inferred that he was in New York to sell the 23 kilos? I don't think that the jury could have inferred that without there being further evidence, but that additional evidence would not come into play for venue because the government seeks to establish venue based on those calls and those communications. With the October 12th call, as I understand it, Thomas calls up Mr. Jackson and says, you better get down here, things are going to get ugly soon, which is effectively a collection process on behalf of the conspiracy.  And we know from case law it doesn't matter what the directionality of the call is to from. So if it's going into the state of New York, then that call is certainly directed there in furtherance of. Does that mean that for Thomas there is now a second touch with New York, October 4th and October 12th? No, because even if we were to draw the facts that or look at the facts regarding October 4th call in the government's favor to establish that somehow Thomas knew that Jackson was in New York, Thomas did not know whether Jackson continued to be in New York after that October 4th date. So he had no idea as to how long Jackson was in New York. And in any event, he didn't know that he was in the southern district? He did not know he was in the southern district. Is there anything in the record that you're aware of that indicates that there was any contact between any of the defendants that indicated it was southern district? There is nothing in the record to indicate from Jackson going to the defendants to indicate that he was specifically in the southern district of New York. And with regards to foreseeability, I have... Is there any case law on whether New York is sufficient to cover the southern district of New York? None that I could find. Now, with regards to the trial court's finding regarding foreseeability, my response on behalf of Mr. Thomas is the same as that of Mr. Tangyuck and Mr. Parilla, which is that there's nothing in the record to indicate that Mr. Thomas had any knowledge of Derek Jackson's history with New York such that it would make the factors that the court relied on foreseeable. Any evidence that Jackson had sold drugs or that they knew that Jackson had sold drugs previously in New York? None. And there is also no evidence that Mr. Thomas himself knew that the price of cocaine in New York was higher than the price of cocaine in Florida. Well, could a reasonable jury draw that inference that he must have known if he was in the drug trade? Well, there was no... Outside of this one case and this one act where it's alleged that Mr. Thomas assisted with packing a crate, there was no evidence to show that there was any other history with regards to drugs or that Mr. Thomas was particularly sophisticated or knowledgeable about the drug trade such that that inference could be made. Thank you. Thank you. We'll hear from the government. The basic question is, you know, the phone calls said, I'm in New York. Is that enough to establish a presence in the Southern District of New York? It is, Judge Chin, and it's important to bear in mind that here the standard is not actual knowledge. It's only reasonable foreseeability with the evidence presented in the light most favorable to the government on appeal, and it was reasonably putting aside that these defendants had... Did someone notice that that person is in the Southern District of New York? I think... We issued a decision on venue about a month ago, and there was an issue about a 718 number, and the government didn't rely on the 718 number because 718 could include the Bronx. And so there it was important whether it was New York or Manhattan or Brooklyn. What the court's prior precedents in cases like Davis show is that it's not necessary for the government to prove the defendant's actual knowledge that the person was in the Southern District of New York. And by way of example, this court has concluded... I understand that foreseeability is enough, but is it enough to... Is it foreseeable that someone will go into the Southern District of New York if the person says, I'm in New York? Yes, it is. I think New York is the most reasonable interpretation of that as being in Manhattan, and it was evidence in the record that cocaine... And it's okay for a jury to conclude from that that he would be in Manhattan when he said, I'm in New York? It is reasonable for the jury to conclude that, and it was also where the cocaine prices were the highest anywhere in the country, and I think it's... But for that, for the cocaine price, if your argument is that the cocaine price being the highest in New York in the country, therefore, with a big drug deal, it's foreseeable that a dealer is likely to go to New York, doesn't that mean that venue is always appropriate in New York for a big drug deal, no matter where in the country the drugs may enter? We're not arguing that, Judge Forrest, and I think it's important to bear in mind what the context is here for this drug deal. Jackson took the 25 kilos of cocaine on consignment from Perea, meaning that he didn't pay for them outright when he got them. He owed Perea hundreds of thousands of dollars in proceeds that he was going to use to pay Perea through his drug sales. Gary Thomas was on the hook for Jackson, so he had to pay Perea in the event that Thomas did not pay up. And why that's important is all of these defendants had a vested interest in finding out where Jackson was. The purpose of this conspiracy at this point was to get paid and to get repaid through Jackson, and so... But wouldn't you think then that if they all had an interest in finding Jackson, which is true, that number one, they would have known where he was, or two, there would have been something that indicated that they knew where to look. Instead, there is direct testimony from Jackson that he didn't tell anybody where he was going, that he didn't tell anybody who was going to be selling drugs in New York, and that the co-conspirators are saying, where is Jackson? So you would think that if all of your rationale is correct, that they would have thought, hmm, he's probably in New York. Well, I think, first of all, it was foreseeable to them, certainly, that someone of Jackson's stature, who was a drug dealer dealing in multi-kilogram loads of cocaine, when he said he'd be on the road, it was certainly foreseeable to them that he would end up in New York. But there's also another point, and the defendants spliced these calls in the light most favorable to themselves. Jackson pointedly told both Tanyuk and Thomas in recorded calls that he was in New York. During those specific calls, both Thomas and Tanyuk used those calls in furtherance of the conspiracy, just as was done in the Romney case. Tanyuk said, do your thing, man, take your time. Gary Thomas reiterated the fact that he had been paid by Perea, so he used the call to explain the current status of the conspiracy from his perspective. Even after that took place, immediately after Tanyuk was told specifically that Thomas was in New York, there is a call between Thomas and Perea. What happens within the Southern District of New York in furtherance of the conspiracy? There are several things. First, during the... The words, do your thing? Yes, because that call is a direction from Tanyuk. It is addressed to the status of the conspiracy. There is also a call with Thomas in which Thomas... Isn't it more like you're going to do what you're going to do as opposed to... But I think the Court should bear in mind too that immediately after that call with Tanyuk, Tanyuk calls Perea, and the Court is... I mean, the jury certainly could infer from that call that at that point, Perea has knowledge that Jackson is in New York. And then there is a text message in which Gary Thomas says to Thomas, pay up, it's about to get ugly. And the reason for that was that Thomas was on the hook for the cocaine and Gary Thomas was on the hook for Perea. That certainly in and of itself was an act in furtherance of the conspiracy that was known to all of the co-conspirators. Do you agree that as to each of the co-conspirators, the activity in New York had to be reasonably foreseeable? No, Judge Carney. I think what the Ramirez-Amaya case says is that a single overt act is enough to establish venue as to all co-conspirators and Romney... Regardless of whether it was reasonably foreseeable to each of the individuals? Correct. Neither Ramirez-Amaya nor the Romney case require reasonable foreseeability as to each defendant, but we've netted it. If it's reasonably foreseeable as to one, then that's enough for all the co-conspirators, no matter how large the conspiracy, how local. Yes, under those precedents. And Romney itself makes clear that at most the government needs to show reasonable foreseeability, and the jury instruction at issue in Romney didn't even include a reasonable foreseeability component. Here, the instruction directed the jury to find that it was reasonably foreseeable as to each defendant, as to the defendant you are considering. Yes, and we've satisfied that here because as of the time of Jackson's call, you're saying the law doesn't require it, but you showed foreseeability as to each defendant anyway? That's correct, Judge Chin. What was there to show Perea? Well, with Perea, immediately after Tanyuk was told by Jackson that Jackson was in New York, Perea exchanged a phone call with Tanyuk. The jury could infer from that phone call that at that moment, Perea had knowledge that Jackson was in New York. In addition, there was a text message. But did anything happen? At the point that he acquired knowledge, did anything happen within the Southern District in furtherance of the conspiracy? Yes, because in those phone calls with Tanyuk and Thomas, both of those defendants, Tanyuk and Thomas, used those calls to further the conspiracy. But in addition, this threat that was communicated shortly thereafter by text message from Gary Thomas was a threat that Thomas needed to pay up, excuse me, that Jackson needed to pay up or it was about to get ugly. Judge Nathan concluded at sentencing that that was a threat that was communicated by Perea through Thomas, and the jury was free to conclude that in finding venue, that that was a threat that came originally from Perea through Thomas into the Southern District of New York. And I think it's also important to bear in mind, too, that this conspiracy continued for months after. There's some question as to whether substantial contacts applies. If it does apply, what are the substantial contacts here between the conspiracy and the Southern District of New York? As an initial matter, this Court has made clear that if venue is established, then the substantial contacts test is satisfied because a single overt act in furtherance of the conspiracy is enough to establish substantial contacts. So certainly Jackson's trip across the Verrazano Bridge is enough to establish. But that wasn't foreseeable to anyone. It certainly was foreseeable to all three defendants that Jackson would hit the road with a— Based, again, on the theory that you can get more money for the drugs in New York. And it's not only that. If you've gone to Pittsburgh or Philadelphia or wherever, somewhere out of Florida. So you would be arguing that that was foreseeable also, so long as the price was higher. No, not necessarily, Judge Carney. And I think the reason for that is Jackson himself, first of all, had a connection to New York. And second— Who knew? Well, the jury had—the evidence before the jury— Did the other defendants know that he had a connection to New York? The other defendants— The proof established that the other defendants had a relationship with Jackson. While there was no specific proof on point that he— Was there evidence that they knew of his connections to New York? No, but the point here is that this is a preponderance standard. It's a foreseeability standard. And the jury could credit the inference that they would have known based on their prior contacts with Jackson that he had a connection with New York. Because I understood the record with regard to Perea and, in fact, all the defendants that the testimony from Jackson, when I was reading his direct and his cross-examination, was that he only met these people, all of them, in 2010. He was in jail until 2009. None of them were involved in the 2003 drug deal that involved other situations. So he is only known to them as of 2010. And Perea, he has a very short interaction with down in St. Croix at the direction of Thomas. So where is the jury to speculate that this exchange of information regarding his background occurs? And wasn't his daughter, in any event— She was in college in New Jersey, not in New York. So that contact is something that just only puts him in the Northeast. It doesn't put him in the district. And the drug dealing was in 2003. That's true, Your Honor, but there are three independent bases here. First of all, you have, in terms of the foreseeability, you have not only the fact of the prior relationship between Thomas and Tangyuck with Jackson. Secondly, you have the point, and this is consistent with this Court's precedence, in finding, for example, that when child porn is advertised in Kentucky, it could end up anywhere in the country, including in New York, that when someone trades in a security— We're back to the argument that any time there's a substantial narcotics deal, it is reasonably foreseeable that some of that will end up in New York. In the context of this case, because for two reasons. First, because the proof was the price was the highest here in New York. And secondly, because these defendants all knew that Jackson was getting the cocaine on consignment and would have to sell a portion of it. Is there evidence in the record? What is the evidence that the defendants knew that the price was substantially high? Perea sold his 53 kilos in four days in Florida, right? That's true, and I think the point is that these were sophisticated defendants, drug dealers, and the jury certainly could credit the inference. Is there evidence that Mr. Thomas had a history of narcotics activity? In New York? Or anywhere, that he was sophisticated enough to know that he could get a lot more money in New York? Well, he certainly was sophisticated insofar as he used— I think the jury could credit the inference that he had used his own shipping company to ship the cocaine and to transport it from the Virgin Islands to the United States. But I also—I think— You don't think it's asking for speculation? Well, I think— The jury to say because he shipped 80 kilos in from St. Croix to Florida, he must know that you can get a lot more money in New York and that therefore Jackson probably is going to go up to New York, into the Southern District of New York, and to try to sell the drugs. It certainly is foreseeable. It's not speculation. It's not speculation. It's foreseeable. But separately, all of the defendants as of October 4th have actual knowledge that Jackson is in New York and under Romney, they used the phone calls with Thomas in furtherance of the conspiracy. But Romney— That alone— But counsel has pointed out that Romney took place in the context of a conspiracy that Romney told Bosch he wanted the ecstasy imported into New York. It was the object of the conspiracy, and they decided Miami was the port of entry. And they said, no problem. We can have our people from New York come down there. That was the context for the whole undertaking. That isn't the case here. Well, Judge Carney, I think the point is that what Romney—first of all, Jackson's crossing the Verrazano Bridge with the cocaine was an act in furtherance of the conspiracy. That was before he was arrested. But separately and apart from that— Yeah, but we're still talking about foreseeability to the other co-conspirators. Yes, but there's also the actual knowledge component of Romney. Romney says, first of all, irrespective of whether the call was exchanged with a government informant or an undercover agent, irrespective of the direction of the call, so long as the call is used in furtherance of the conspiracy, that alone is sufficient to establish venue. That was done at least three times by these co-conspirators. But I think your adversary would point out that the court—we found that sufficient in the context of a conspiracy that was oriented around conducting drug sales in New York. And therefore, when you look at what the holding is, although the language may have been somewhat broader, it's less of a stretch than we are confronting here, isn't it? As Judge Nathan concluded in denying the defendants Rule 29 motions in a very thorough opinion, the facts of Romney don't state that those facts are required in order to establish venue, that they were simply sufficient under the facts of that particular case. But under the operative language, the rule of law as articulated in Romney, clearly there were at least three calls exchanged in which the defendants are furthering the conspiracy when they have actual knowledge that Jackson is in New York. They are using the phones with the Southern District of New York to further the conspiracy. With the government's position on foreseeability as to the Verrazano Bridge, then all you have are the phone calls. And those calls and the mention of New York are done specifically at the behest of the agents. So it does look like this is a manufactured venue case. It is not, Judge Chen, and the reason for that is it was Jackson's own conduct in furtherance of the conspiracy that took him up to New York. And secondly to the Southern District of New York. And you continue to blur. It may be logical, but it seems to me we've got to observe the formality of the distinction between the Southern and the Eastern Districts of New York. The only reason Jackson is in the Southern District of New York is he's arrested. The agents ask him to make the phone calls. The agents ask him to say you're in New York. Right? I was not a part of the case at that time. I don't dispute Your Honor's characterization of it. But I think the important point here is that, first of all, Rami has made clear that no court has ever dismissed a case or overrode a venue finding on the ground of manufactured venue. I don't think there's a case where the connection to the district is so tenuous. In Rami, they wanted to send the drugs into New York. I think it's separate here too because Is there any case like this where, again, putting aside the foreseeability of the Verrazano-Narrows Bridge, but where the only connection is the agents bringing the person into the Southern District and asking the person to call and asking the person to mention New York? Another case like this? I think it's even more tenuous in cases in which this court has found that, for example, when someone trades in a security, that he could be hailed into venue in the Southern District of New York even if that trader has no idea that the trades would be traded. I don't know. Those cases say it has to be foreseeable to the trader. That's true. That's the Lane decision from about six weeks ago. But, again, I think it's important to bear in mind the context here, that the object of the conspiracy at the time these consensual calls were being placed was to get paid, to get back the money from Jackson. And even after they all have actual knowledge from Jackson that he's in New York, they take steps for months to get their money back, to find Jackson. So we've got Tang Yuk who's got the October 4th call and just that call. And then after that, in terms of injecting himself or foreseeing anything in the conspiracy for Tang Yuk vis-à-vis Jackson directly, it goes cold, right? That's not true, Judge Farris. And the reason for that is that after the call, Tang Yuk takes a more enhanced role in the conspiracy. And as he says in recorded calls, he is working on the front line and on the same page with Thomas and Perea. And it's not simply some amorphous participation in the conspiracy. The purpose at that point is to get the money back from Jackson, to find out where he is and get it back. And he exchanges a call with Perea on a wiretapped call in which he says, Thomas ate the food, which means essentially Thomas made off with the drugs and hasn't paid you. So, again, this is an act in furtherance of the conspiracy once Tang Yuk has actual knowledge that Jackson is in New York. But then in subsequent call in November of 2012, Perea says to Tang Yuk, your friend, and I've forgotten the wording, is playing hide-and-seek, which suggests, contrary to what you're arguing now, that he did not know or have actual knowledge as to the location of Jackson. No, Judge Forrest. I think the most in the context, given that Tang Yuk had actual knowledge from Jackson before that call was placed, the most reasonable interpretation of that argument is simply that Jackson, even though they knew he was in New York, he was ducking Perea and he was ducking Thomas, not simply that they didn't know where he was, but simply that he was being evasive and was not paying the money back. Unless the court has any further questions, the government will rest on its submission. The judgment of the district court should be affirmed in all respects. Thank you. We'll hear the rebuttal. Your Honor, as a guy from Long Island, I must take issue with the government's assertion that New York only means Manhattan. It cannot only mean Manhattan. New York is a very big state. Buffalo is in New York. Albany is in New York. Niagara Falls is in New York. That is not enough information to rely on. Judge, one of the cases that the government cites in Manhattan. The government says it's just a matter of foreseeability by a preponderance and that a jury could find that when you say I'm in New York, that that means that probably, more likely than not, you're in Manhattan. I don't think there's any evidence of that, Judge. I haven't seen any cases that support that notion, and I would submit to the court that that is erroneous. I'm from New York, and I'm not from Manhattan, Judge. I'm living proof that that is not so. Judge, one of the other points that was in my brief and was touched upon by the government were the threats. It was alleged that my client in a conversation with Mr. Tang Yuk made threats against Mr. Thomas and Mr. Jackson, and the government at sentence assessed an additional two offense-level points on that. Judge, those threats in the entirety of the context of the conversation, first and foremost, the conversation was never conveyed to either Mr. Thomas or Mr. Jackson. There was no evidence of that. Second, I just wanted to point the court out to the very last line of this conversation was Mr. Parilla saying, I wash my hands of that. He said that the entirety of the conversation was, if I see him on the side of the road, I would run over his mother expletive. Or what was the other part of it? Tang Yuk said, I don't know how he can live like that. And in response, he said, he might die like that. And then his last words were, I wash my hands of it. Judge, I think that conversation was pure hyperbole. It was in the ‑‑ But isn't that exactly the kind of thing from which different reasonable inferences may be drawn? You draw one, the sentencing judge drew the other, and it's only ‑‑ you've raised it now in this portion of the argument in the context of the sentencing proceeding. It's only by a preponderance. And, Judge, when he says, I wash my hands of that, he reneged. He negated everything he had said previously. I don't think ‑‑ It's an inference. It's an inference you're drawing. Yeah, I mean, it's a common expression that we all use. I wash my hands of that. Since the time of Caesar, we have used this expression, Judge. You know, I don't think that by a preponderance standard should give Mr. Parilla two additional offense level points. Thank you, Your Honor. Thank you. Your Honors, I just wanted to come back briefly, I'm not even sure I'll need all my time, to this issue of venue and a few of the points that the government has made. And I think to Judge Chinn's point about the issue of the Southern District versus the Eastern District of New York, it's worth noting, even if you assumed all this knowledge that the government wants to build into the defendant's awareness of where the cooperator was going to sell his drugs, he went to Queens. He went to the Eastern District of New York, and he was arrested in the Eastern District of New York. So even if you play out the government's theory, you wind up across the river in the Eastern District of New York. And so I don't think ‑‑ But it is established that driving across the Barrisono Narrows Bridge is an act within the Southern District, isn't it? Absolutely, Your Honor. We've never contested that issue. The issue for us on that point was the reasonable foreseeability to any of the defendants that he actually did that. My only point is if you're going to instill all of this knowledge into the defendants about their familiarity with Mr. Jackson, one would assume they would have known he was going to Queens, not Manhattan, to sell those drugs. Second, I think to the point one of your honors made during the course about the breadth of the government's theory and what this could mean, I mean, if you look at page 33 of their own brief, as they describe the sheer size of the drug shipment and the common sense components of it, they say at the end, accordingly, it was foreseeable to the defendants that Jackson planned to sell cocaine elsewhere, exposing them to prosecution at that location, essentially creating a national venue for drug trafficking that occurs in the ‑‑ Is that really fair? A national venue? It just doesn't limit it. It's wherever he ended up getting caught selling the drugs that they would be vulnerable potentially. If they accepted it and knew that he was entitled and planned to go out of state someplace, they didn't really care where so long as they paid him. I think, Judge Carney, the law is different, that each defendant needs to reasonably foresee where that location is going to be. So you're saying because he could have gone anywhere, they should have foreseen that he could have gone anywhere and they were then subject to venue anywhere. Correct. How do you respond to the government's argument that it need only prove that one co‑defendant reasonably foresaw or should have reasonably foreseen that the activity would reach into the Southern District? That's inconsistent with the individualized nature of the charge. The jury was specifically told to consider each defendant separately on the counts of the conspiracy as well as venue. The law requires. for a defendant in order to establish venue. Now, it could be foreseeable that another defendant is going to assert himself into the district. It doesn't have to be that individual, but it has to be something more than unknowing participation by a third party. And you're saying it has to be foreseeable as to each defendant? It has to be foreseeable as to each defendant, Your Honor. Thank you. Your Honor, I would also agree that the foreseeability must be individualized. It's a constitutional right that attaches to a specific defendant. And particularly in this case where the only foreseeability was with Jackson himself, to import Jackson's knowledge of his own life history to the other three defendants, I think, would violate their constitutional right to be tried in a jurisdiction where venue is proper. Now, with regards to the ‑‑ there are some additional facts that I believe support Mr. Thomas' argument. One thing that I think the court must bear in mind is that Mr. Jackson did not have a New York cell phone. Mr. Jackson's cell phone was a Florida cell phone. The area code for his cell phone number was for Florida. And I say that because this isn't a case like Ramy or some of the other cases in this circuit where the defendant was calling New York specifically. Whether he was calling someone with a New York cell phone, whether he was calling someone at a pay phone that was in New York, the defendants are contacting a Florida number to an individual who they know lives in Florida. So even when Derek Jackson contacted Mr. Thomas ‑‑ The record that says he lived in Florida? Correct. And that's where he lived with his wife. And they drove from Florida to New York. So I also think that those facts are important. What's also important is that this investigation didn't begin with any of these defendants. It didn't even begin with Jackson. It began with a New York drug dealer named Fulton who was the other individual that was in Queens taking the drugs from Mr. Jackson for distribution. This was a New York investigation of a New York drug dealer that then connected to Jackson. This was not an investigation involving any of these three defendants. And one thing that hasn't been mentioned, which may or may not be significant, is that these three defendants were from the Virgin Islands. They were from St. Croix. So when there are statements being made by the government to the effect that, well, New York would mean Manhattan, it would not mean Manhattan for someone. Young was from St. Croix? Tang Young was from St. Croix. He lived in Florida, but he was from St. Croix. Well, as a matter of reasonable inferences, if you say to someone from Europe that I'm in New York, the chances are good that they will think it's New York City, that you're talking about a city rather than saying I'm in Buffalo or I'm in Albany. I mean, it's not unreasonable for someone to infer that, it seems to me. With all due respect, it would be unreasonable for these defendants, and I'll say this as someone who's grown up in St. Croix, who went to high school in St. Croix, when you mention New York, I would venture to say that most people in St. Croix think of Brooklyn because they think of the West Indian Day Parade. So the culture of the Virgin Islands and these defendants would have a closer link to Brooklyn than it would have to Manhattan. And that's what they would associate New York with. They would associate New York with their culture, which, you know, plays out in Brooklyn. Was Mr. Jackson's prior drug involvement in Brooklyn? I don't know. I don't know, and I don't think it's in the record. So with regards to even viewing the facts in a light most favorable to the government, what the facts do bear out is none of these defendants, including Mr. Thomas, had any knowledge of Mr. Jackson's personal history and any associations he may have had with the East Coast of New York. It was never even suggested by the government at trial that any of these defendants, including Mr. Thomas, knew that the price of drugs was higher in New York than it was in Florida. I'm sorry, Your Honor. So in conclusion, I think when you look at the totality of all of the circumstances that were raised in the briefs and the oral arguments today, the court should overturn the findings of the lower court and vacate the judgment. Thank you. Thank you. We'll reserve decision.